THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL S. TRIPP,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )
                                     )   No. 10 c 3381
MICHAEL J. ASTRUE,                   )
Commissioner of Social               )
Security,                            )   Magistrate Judge Arlander Keys
                                     )
                Defendant.           )

### MEMORANDUM OPINION AND ORDER

Procedural History

On July 2, 2007, Michael Scott Tripp filed an application
for a period of disability and disability insurance benefits
under Title II of the Social Security Act.[1] Record at 95.  He
contemporaneously filed an application for Supplemental Security
Income, under Tile XVI. Record at 92.  Mr. Tripp alleged that he
became disabled following an automobile accident on January 28,
2007.  Record at 13.  The Social Security Administration denied
Mr. Tripp's claim for Supplemental Security Income on July 9,
2007 and his disability claim on August 10, 2007. Record at 40,
63.  Mr. Tripp filed requests for reconsideration on both claims
on September 12, 2007. Record at 50.  On December 17, 2007, these
requests were denied. Record at 52.  Mr. Tripp filed a request

---

[1] The ALJ and defendants stated that Mr. Tripp applied for
disability insurance benefits on June 20, 2007. Record 13.

for a hearing before an Administrative Law Judge ("ALJ") on February 2, 2008 for his disability claim. Record at 57. He did not purse the Supplemental Security Income claim. Record at 57.

On May 14, 2009, Honorable John L. Mondi presided over Mr. Tripp's hearing at the Office of Disability Adjudication and Review in Oak Brook, Illinois. Record at 20-36. On June 26, 2009, the ALJ issued an unfavorable decision against Mr. Tripp. Record at 19. The ALJ held that Mr. Tripp was not disabled, as defined in the Social Security Act. Record at 19. Mr. Tripp filed a request for review on July 15, 2009. Record at 7. The Appeals Council denied review of the ALJ's decision. Record at 1. Therefore, the ALJ's decision became the final decision of the Commissioner of Social Security. Record at 1.

On June 2, 2010 Mr. Tripp filed a complaint in the United States District Court for the Northern District of Illinois seeking judicial review of the Commissioner's decision. Record at 13. The parties have both moved for summary judgment; Mr. Tripp asks that the ALJ's decision be reversed or remanded, and the Commissioner asks that the ALJ's decision be affirmed.

Factual Background

Mr. Tripp was born on February 15, 1963. Record at 24. On January 28, 2007, he was in a car accident, in which he sustained "multiple tibia and fibula fractures with displacement at the

2

ankle mortise." Record at 13, 201. Following the accident, Mr. Tripp underwent surgery on January 30, 2007. Record at 210. His wounds healed well and x-rays showed satisfactory alignment of the fractures. Record at 214. He underwent physical therapy for several months and has been treated by a number of doctors. Record at 221-61. However, Mr. Tripp contends that he has never fully recovered and is now unable to work. Record at 95.

## A. Hearing of May 14, 2009

At a hearing on May 14, 2009, the Administrative Law Judge heard testimony from Mr. Tripp and from Mr. Lee Knudson, a vocational expert ("VE"). Record at 10-19.

### 1. Mr. Tripp's Testimony

Mr. Tripp, who was forty-six years of age at the time of the hearing, testified that he was 5'9 and weighed 260 or 270 pounds. Record at 29. Mr. Tripp also testified that he was divorced and had two adult-aged children. Record at 24. Additionally, he testified that he had not had health insurance since his divorce in 2001. Record at 30-31.

With regard to his prior work experience, Mr. Tripp testified that he had not worked since 2006 when he earned $6,737.00 as a self-employed home remodeler and handyman – a job he had done for four years prior to the accident. Record at 25. He testified that he painted, remodeled bathrooms and built decks

3

and that the jobs involved lots of heavy lifting. Record at 26-27. Mr. Tripp testified that, prior to this job, he managed an office furniture warehouse, a job that involved less heavy lifting but a lot more walking. Record at 27. He testified that in that job, he supervised 15 employees. Record at 27. Mr. Tripp testified that, before the warehouse job, he worked for a foundry equipment dealer as a warehouse manager, a job that also involved heavy lifting. Record at 27-28.

Mr. Tripp testified that he was in a car accident in January of 2007. Record at 25. He testified that, as a result of the accident, he fractured his right leg in multiple places, and he used a crutch to walk most of the time. Record at 25-26. There have been a couple of days, he testified, when the pain was not bad and he did not need the crutch. Record at 26. Mr. Tripp stated that he underwent surgery two days after the accident and went back to see his doctor every month following the accident. Record at 26. He testified that he did not believe his ankle was healing and he sought a second opinion. Record at 26. Mr. Tripp indicated that this doctor told him his cartilage was dead and needed to be fused, or that he needed to have an ankle replacement in order to heal. Record at 26. Mr. Tripp testified that he had been prescribed Celebrex once a day and Vicodin on an as needed basis. Record at 29, 31-32. He testified that he took

Vicodin about three or four times a week. Record at 29, 31-32. When asked if he experienced any other problems following the accident, Mr. Tripp testified that he had a tendency to forget things and that he had a degenerative disk disease. Record at 28. He also stated that he has seen a counselor for depression and anxiety at Kendall County Human Behavior and that he was in a bipolar depression support group at Mercy in Aurora. Record at 31.

With regard to his daily activities following the accident, Mr. Tripp testified that he spent most of his time sitting. Record at 28-30. He testified that he could walk about 20 or 40 feet with a crutch and a couple of steps without a crutch. Record at 28. The only exercise, Mr. Tripp stated he could do was upper body exercises from a sitting position. Record at 30. Mr. Tripp stated that he did not have problems sitting for long periods of time if his leg was elevated. Record at 28. He testified that he was unsure how much weight he could lift, but that his doctor gave him a five-pound limit. Record at 28. Mr. Tripp indicated that he could climb a flight of stairs, one step at a time, with his crutch and a rail. Record at 29. Also, Mr. Tripp testified that he cared for himself, but that he lived with his unemployed son who helped around the house. Record at 30. He also testified that he could drive, but that it was difficult for him to drive

long distances. Record at 30. Overall, Mr. Tripp testified that he believed his condition was getting worse. Record at 30.

## 2. Testimony of Lee Knudson, Vocational Expert

The ALJ also heard testimony from Lee Knudson, a vocational expert. Record at 33. The VE testified that Mr. Tripp performed heavy and skilled work at his last job as a self-employed remodeler, and he gave this job a Specific Vocational Preparation ("SVP") of seven. Record at 33. The VE testified that, when Mr. Tripp worked as a warehouse manager for a furniture company, he performed medium and skilled work, SVP eight. Record at 33. And he testified that, when Mr. Tripp worked as a warehouse manager, his responsibilities were very close to those of a maintenance mechanic, which is considered skilled and heavy, SVP of seven. Record at 33.

When asked by the ALJ to consider a hypothetical individual with the same work experience, age and high school education as Mr. Tripp, the VE testified that a hypothetical person who had the residual functional capacity that was projected for Mr. Tripp would be able to do light work. Record at 34. VE Knudson testified that, although this hypothetical person would have no additional limitations, he would not be able to return to the type of work Mr. Tripp performed prior to the accident. Record at

6

34. The VE testified that this hypothetical person would, however, be able to hold some sort of warehouse manager position or some sort of contracting or estimating position. Record at 34. VE Knudson explained that, if this hypothetical person were able to perform the full range of light work, there were approximately 4,000,000 possible jobs in the Chicago metropolitan area. Record at 34. He estimated that there were at least 500 light working warehouse managers or supervisors and 500 estimator/contractor positions in the Chicago area. Record at 34.

The ALJ then asked whether these estimates would change if the hypothetical person needed an assistive device to ambulate, and VE Knudson testified that they would. Record at 34. In fact, VE Knudson testified, if the individual needed an assistive device, the warehouse manager and contractor positions would be eliminated, and the person would be limited to sedentary work. Record at 34. He testified that, at the sedentary level, the person could perform unskilled work such as a bench assembler (approximately 2,900 jobs in the area), telephone order clerk (approximately 3,600 jobs in the area) or surveillance system monitor or unskilled security personnel (approximately 2,000 jobs in the area). Record at 34-35.

The ALJ then asked the VE to consider whether his answers

would change if the ALJ were to credit the limitations claimed by Mr. Tripp. Record at 35. The VE testified that, "if you followed his testimony, he indicated, due to pain and, and adjustment problems from the injury, that he probably would have difficulty sustaining a work pace at even a sedentary level eight hours a day 40 hours a work week, you know, without some sort of pain related interruption." Record at 35. The VE testified that, in his view, Mr. Tripp's testimony indicated that he would have trouble meeting an employer's attendance requirements, and he noted that, for a simple, unskilled job, an employer would likely not tolerate absences of two or more days per month. Record at 35.

At the end of this line of questioning, the ALJ gave Mr. Tripp's lawyer an opportunity to question the VE, and he chose not to do so. Record at 35.

### B. **Medical Evidence**

In addition to the testimony of Mr. Tripp and the vocational expert, the ALJ had several reports and an abundance of medical records before him. The record shows that, on January 28, 2007, Mr. Tripp was in a car accident. Record at 212. Following the accident, Mr. Tripp was brought to Memorial Medical Center (Centegra Health System), where he was diagnosed with "lacerated

wound to the left temporoparietal scalp," which was stapled, and trauma to his right leg. Record at 197-99, 205, 281, 285. Mr. Tripp's x-rays were reviewed by Dr. Robert F. Hall, who observed that there was swelling of the ankle and that Mr. Tripp had "multiple tibia and fibula fractures" in his right foot. Record at 201. Dr. Hall noted that Mr. Tripp would need surgery to repair his ankle. Record at 272.

The record shows that, on January 30, 2007, Dr. Hall operated on Mr. Tripp's right ankle. Record at 187, 210, 296, 369, 403. During the operation, Dr. Hall fixed the ankle fractures by "placing interfragmental screws within the butterfly fragment" Record at 187, 210, 296, 369, 403. To repair Mr. Tripp's ankle "a three hold, 1/3 semi-tubular plate was configured as a spring plate and pressed against the tip of the Chaput fragment." Record at 187, 210, 296, 369, 403.

Mr. Tripp returned to Dr. Hall several times after surgery, including visits on February 8, 2007 and February 15, 2007. Record at 214, 293, 366. During both appointments, Dr. Hall noted that Mr. Tripp's wounds were "dry and healing well." Record at 214, 293, 366. On February 8, Mr. Tripp filled out a patient history form that asked whether his ankle was getting better and he answered "yes." Record at 294, 367. He also indicated on the

9

form that there was "less swelling" but that he was having trouble walking. Record at 294, 367. On February 15, 2007, his x-rays showed satisfactory alignment of the fractures. Record at 214, 293. On March 15, 2007, Dr. Hall examined Mr. Tripp again and determined that his fractures were healing and that he should begin physical therapy. Record at 215, 292, 365.

On March 29, 2007, Mr. Tripp had his initial evaluation at Advanced Physical Medicine in Yorkville, Illinois for physical therapy. Record at 239, 253. According to the notes from that visit, he indicated that he had difficulty with standing and walking, and that rest relieved his pain. Record at 253, 414. He also indicated that, on average, his pain was a level two out of ten (ten being the worse possible pain) and at its worse his pain was a level three out of ten. Record at 259. The next day, Mr. Tripp filled out an ankle grading system, indicating that his pain was "slight"; that he needed crutches to walk; and that he only had "moderate" function. Record at 251. Mr. Tripp continued physical therapy about once a week in April, May, June, July, and August. Record at 226, 230, 231, 233, 234-35, 236, 238, 237, 240-46, 249-50, 253-259, 295, 336, 339, 341, 344, 345, 349, 351-52, 354-55, 357, 368, 405, 411, 423, 424, 425, 426. During Mr. Tripp's physical therapy treatments in April, he initially

indicated no notable increase in pain (on April 5, 2007). Record at 237, 424. However, throughout Mr. Tripp's physical therapy appointments he indicated "numbness" (on April 10, 2007), "tightness" (on April 9 2007), "stiffness" (on April 5, 2007, June 26, 2007, June 28, 2007, July 12, 2007, July 26, 2007, August 6, 2007, and August 9, 2007), "tenderness" (on June 21, 2007), "swelling" (on July 12, 2007 and August 2, 2007), "discomfort" (on April 16, 2007), "soreness" (on April 16, 2007, May 18, 2007, June 20, 2007, and July 20, 2007) and "fatigue" in his ankle (on April 16, 2007). Record at 233-37, 333-40, 344, 424-27. In fact, his therapist, Dr. Angelo Reyes of Advanced Physical Medicine, recommended that Mr. Tripp continue to receive therapy beyond the initial prescription because he continued to experience "a great deal of pain." Record at 295, 368.

Mr. Tripp did continue physical therapy in May of 2007. Record at 233, 249-50, 344-46, 355, 357, 405, 411. He filled out a new ankle grading system on May 14, 2007 and indicated that his pain was now moderate but that his function was now slight instead of moderate. Record at 250, 411. In addition, he reported that he still needed crutches to walk, but that, for the first time, he was able to walk one block. Record at 248, 250, 356, 411. In May 2007, Advanced Physical Medicine indicated that

Mr. Tripp's injury was moderate but that there were impairment characteristics such as "pain," "range of motion," "muscle weakness" and "function." Record at 246, 405. At the end of May, Mr. Tripp's reports indicated that his ankle was not 100%, but improved; they also noted that he experienced pain if he was on his feet for too long. Record at 343.

On June 1, 2007, Mr. Tripp's physical therapist indicated that he was still using his crutches, but that his ankle was improving. Record at 231. However, by June 13, 2007 his ankle was hurting again, possibly due to increased activity. Record at 230, 341. Mr. Tripp's physical therapist made a revised treatment plan for Mr. Tripp on June 15, 2007. Record at 243. The plan indicated that Mr. Tripp's injury was still moderate, but that the only impairment characteristics now were pain and function. Record at 243. However, that same day, Mr. Tripp indicated that his pain had worsened considerably and was "continuous." Record at 245, 353. He reported that he could no longer walk one block, and that he still had to use crutches. Record at 245, 353.

On July 10, 2007 Mr. Tripp returned to physical therapy, indicating that his right ankle was better than usual because he had been "totally off of it for a few days." Record at 226. A

week later, Mr. Tripp told his physical therapist that his pain
had decreased to only hurting during a "level gait" or on stairs;
he reported no pain while resting.  Record at 242.  However, he
still needed crutches to walk, and he experienced pain on July
20, 2007 when he "over did it" and walked for three hours. Record
at 336.

Things had improved considerably by August 22, 2007, when
Mr. Tripp indicated that he needed a cane only for long walks and
that he was able to walk "1-3 blocks." Record 347.  Despite this,
Dr. Motiani indicated that, overall, Mr. Tripp did not have much
relief from physical therapy. Record at 374.

In addition to physical therapy, Mr. Tripp maintained
regular appointments with various doctors.  Dr. Douglas M.
Gregerson, a radiologist, read Mr. Tripp's x-rays on April 12,
2007 and indicated that there was evidence of healing. Record at
193, 195, 260, 400.  On June 7, 2007, Mr. Tripp went to see Dr.
Thomas Rappette for a second opinion, because his ankle was still
swollen and painful, and because he did not think it was healing
properly. Record at 313, 321.  Dr. Rappette indicated that Mr.
Tripp's ankle was still "tender" and "swollen" but that, from the
x-rays, the fractures seemed to be healed.  Record at 313, 321.
Dr. Rappette's concern was that "the entire articular ankle

13

joint" had collapsed and was causing pain. Record at 313, 321. Mr. Tripp was put on Celebrex 200 mg once a day, and was told that he would most likely need an ankle joint replacement or ankle fusion in the future. Record at 313, 321, 397. On June 19, 2007, Mr. Tripp returned to Dr. Rappette, who advised him that a fusion would be the best procedure for him. Record at 314. Mr. Tripp opted not to pursue that, however, because he had no insurance. Record at 314. Dr. Rappette did proscribe Vicodin for pain. Record at 314-15, 322-23, 325, 379, 398. In his medical evaluation, Dr. Rappette indicated that Mr. Tripp had full capacity to sit and travel. Record at 191, 218. However, he also stated that Mr. Tripp could lift no more than 10lbs at a time and had more than 50% reduced capacity to walk. Record at 191, 218.

From October to December of 2007 Mr. Tripp's doctors indicated that his pain continued. Record at 376, 379, 396. Dr. Motiani indicated in October that Mr. Tripp suffered from post op pain and non-healing. Record at 376. Additionally, in November, Dr. Rappette recorded that Mr. Tripp's ankle had compressed further and was very swollen and painful. Record at 396. Dr. Rappette put Mr. Tripp back in a walking boot to prevent further damage to his ankle. Record at 396.

On August 3, 2007, Dr. Robert Patey, a state agency review physician, based on his review of the medical evidence, projected Mr. Tripp's physical residual function capacity as of January 28, 2008, 12 months after his onset date. Record at 298. Dr. Patey indicated that Mr. Tripp would be able to lift 20lbs occasionally and 10lbs frequently, and that he would be able to stand, walk, or sit for a total of six hours in an eight-hour workday. Record at 299.

The record also includes records that were added post-hearing. Record at 429-37. On August 3, 2009, Mr. Tripp had an appointment at Fox Valley Orthopaedics, where a doctor at the facility indicated that "Mr. Tripp suffers from chronic disabling pain...[and] is unable to maintain gainful employment due to his pain." Record at 429, 431. Additionally, Mr. Tripp had an MRI taken of his lumbar spine on August 4, 2009. Record at 435. The medical report indicates that Mr. Tripp suffered from low back pain resulting from his car accident. Record at 435. The report states that Mr. Tripp had multilevel disc degenerative changes, a small right-sided disc hernation at L2-L3 and an extra-foraminal disc hernation at L4-L5, and Grade I spondylolisthesis of L5 and S1 due to bilateral spondylolysis with a possible significant neuroforaminal constriction at this level. Record at 436. Mr.

Tripp also returned to Dr. Rappette on August 11, 2009. Record at 437. Dr. Rappette indicated that Mr. Tripp had trouble ambulating and was in pain and discomfort, and that his symptoms would continue to get worse unless he had surgery. Record at 437. The report stated that Mr. Tripp's ankle had significant osteoarthritis in the entire ankle joint, which caused pain and swelling. Record at 437.

C.    **Disability Reports**

Mr. Tripp submitted several disability reports to support his disability claim. Record at 112-116, 118-146, 158-185.

1.    **Mr. Tripp's Disability Reports**

In Mr. Tripp's reports, he stated that since the onset of his injury on January 28, 2007 he has suffered from constant pain, swelling and limited mobility as a result of the multiple fractures in his right ankle. Record at 112, 116, 136, 141, 144, 145, 174.

Mr. Tripp also answered various questions regarding his daily living. Record at 134-136,158-169.  On July 25, 2007 he indicated that he was unable to do daily chores that involve lifting or carrying bags or baskets of laundry. Record at 134. Furthermore, Mr. Tripp stated that he needed his crutches to get

16

up out of a chair or out of bed, take a shower, use stairs and walk or balance in general. Record at 135. He indicated that his family did his shopping, but that he could prepare his own meals; he testified, however, that he needed to sit and elevate his leg after making a meal. Record at 135. He also testified that he was only able to drive approximately an hour before he needed to elevate his leg. Record at 135. Mr. Tripp indicated that he had to elevate his leg and rest even after short periods of movement. Record at 135, 144. He stated that his doctor recommended twenty minutes of ice after every hour of activity. Record at 135.

Mr. Tripp's condition appeared to have worsened when he appealed his disability claim because, in an undated disability report, he noted that he was supposed to keep his leg elevated most of the time, which further limits the tasks he can perform. Record at 144. He also stated that he was depressed and stressed by the pain and his inability to work and move. Record at 145.

According to the next disability report, completed October 8, 2007, Mr. Tripp's symptoms continued to go downhill. Record at 167. By that time, he moved slowly when using kitchen tools and was weaker in his ability to twist lids and jars because of his lack of activity. Record at 167. He also said he had to go slowly when dialing the phone, when picking up a coin or using a

pen or pencil and when brushing his hair and teeth. Record at 167. Mr. Tripp also wrote that it was hard for him to dress and that he was unable to stretch out. Record at 167. Another indication that his symptoms had worsened was that he could only drive for 45 minutes before he experienced pain. Record at 168. Also, in his first report, Mr. Tripp indicated that he needed assistance when walking and balancing. Record at 135. But by October he also needed assistance when standing. Record at 168. Furthermore, Mr. Tripp mentioned that he had problems remembering things, concentrating and sleeping because of anxiety. Record at 161-62. Mr. Tripp stated that he spent most of his day watching television and resting his leg. Record at 163, 168. Another significant change was that Mr. Tripp began seeing a counselor at the Kendall Co. Health Department for depression. Record at 174.

As in the July 2007 disability report, Mr. Tripp stated that he still needed crutches to carry bags or baskets. Record at 167. He also was still able to sit for at least two hours as long as his leg was elevated. Record at 168. In addition, he still needed the assistance of his crutch to get up from a chair and to shower, but he also indicated that there was pain when he did these things. Record at 167.

## 2. Third Party Disability Report

The record also includes a function report completed by Sharon Leifheit, a friend of Mr. Tripp. Record at 150. Ms. Leifheit indicated that, as a result of Mr. Tripp's injury, it became painful for him to stand on his feet, walk or climb stairs Record at 153, 156. Additionally, his injury affected his ability to lift, reach, squat and kneel. Record at 154. Ms. Leifheit also indicated that this injury had caused Mr. Tripp to have trouble sleeping and caused him increased anxiety. Record at 151, 155.

Also, Ms. Leifheit stated that Mr. Tripp's daily activities have been greatly impacted due to his injury. Record at 156. For example, she indicated that Mr. Tripp could only do light cleaning chores and needed help with his laundry, mowing the lawn and grocery shopping took him longer. Record at 152-53. He could care for himself, but it was difficult for him to get in and out of the bathtub. Record at 151. She indicated that Mr. Tripp was able to prepare his own meals, but it was tiring and "he takes "rests" sometimes before getting down." Record at 152. In addition, Ms. Leifheit estimated that Mr. Tripp can walk 100 feet before needing to rest, and then he would need about fifteen minutes before he could resume walking. Record at 154.

D. **Work History Report**

Mr. Tripp also submitted to the ALJ a work history report and information about his past work experience. Record at 116-117, 127-130. Mr. Tripp indicated that he has had three different jobs in the last 15 years. Record at 117. The longest job Mr. Tripp held was as a warehouse manager from 1991 to 2000. Record at 117, 127. In that job, he worked twelve hours a day, five days a week and made ten dollars an hour. Record at 128. As a warehouse manager, Mr. Tripp was in charge of rebuilding machinery, sandblasting, painting, loading and unloading trucks and dealing with inventory. Record at 117, 128. He had to use technical skills or knowledge with machines. Record at 117. He had to lift parts of machines (100-150lbs.) and carry them 10-15 feet. Record at 117. This occurred five to six times a day. R. 117. The heaviest weight Mr. Tripp had to lift at this job was 250 lbs. Record at 117. The weight Mr. Tripp frequently lifted was 50lbs. Record at 118. In an undated disability report, Mr. Tripp indicated that the majority of his time at this job was spent walking or standing (nine hours a day). He also had to climb, kneel and handle big objects (five hours a day) as well as stoop (three hours a day), reach (two hours a day), crawl (1 hour a day) and sit (1 hour a day). Record at 117. However, Mr.

20

Tripp gave a different report in a work history report from July 25, 2007. Record at 128. In this report, Mr. Tripp stated that he spent the majority of his day walking (four hours a day), climbing (two hours a day), kneeling (one half hour a day), handling big objects (one hour a day), stooping (one half hour a day), reaching (one half hour a day) and he did not crawl. Record at 128. Mr. Tripp also indicated in this report that he supervised others while he was a warehouse manger. Record at 128. Yet, in the undated report, he indicated that he did not supervise people at this job. Record at 118.

According to the report, Mr. Tripp also worked as a warehouse manager for a furniture store from 2000 to 2001. Record at 117, 129. In that job, he worked twelve hours a day five days a week and earned $38,500 a year. Record at 129. For this job, Mr. Tripp managed the warehouse, unloaded and loaded trucks, sorted orders for shipping and tracked inventory. Record at 129. Mr. Tripp used technical knowledge, used machines, tools or equipment and completed reports. Record at 129. The majority of his day was spent walking or writing (3 hours a day each), but he also sat (two hours a day), stooped (two hours a day), crouched (1 hour a day) and stood (1 hour a day). Record at 129. He supervised over ten people. Record at 129. He also lifted boxed

21

furniture and frequently carried fifty pounds. Record at 129.

Finally, the report shows that Mr. Tripp most recently worked as a self-employed construction worker from 2003 to 2006. Record at 117, 130. In that job, he worked eight to ten hours a day, two to five days a week and received twelve dollars an hour. Record at 130. Mr. Tripp conducted home repairs, built decks, painted and remodeled basements for this job. Record at 130. He used technical knowledge or skills and used machines, tools or equipment. Record at 130. The majority of his day was spent walking (four hours a day) but he also kneeled (two hours a day), stood (one hour a day), climbed (one hour a day), stooped (one hour a day), crouched (one hour a day), handled big objects (one hour a day) and reached (one hour a day). Record at 130. The heaviest weight he lifted for this job was 100lbs and he frequently lifted 25lbs. Record at 130.

### THE ALJ'S DECISION

The ALJ issued his decision on June 26, 2009, concluding that Mr. Tripp was not disabled under sections 216(i) and 223(d) of the Social Security Act. Record at 19. In order to reach this conclusion, the ALJ applied the five-step analysis outlined in the Social Security regulations. Record at 13.

At step one, the ALJ determined that Mr. Tripp had not engaged in substantial gainful activity since January 28, 2007, the alleged onset of the disability. Record at 15.

At step two, the ALJ found that Mr. Tripp had severe right ankle impairment. Record at 16. The ALJ stated that this impairment had more than a minimal effect on Mr. Tripp's ability to perform basic work activities. Record at 16. In contrast, the ALJ determined that the other impairments that Mr. Tripp alleged (depression and disc disease) were not supported by the record and were non-severe impairments because they imposed no more than minimal limitations on Mr. Tripp's ability to perform work activity. Record at 16.

At step three, the ALJ held that Mr. Tripp's impairment did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Record at 16. The ALJ cited 1.01 *A Major Dysfunction of a Joint*, which requires "that the injury results in the inability to ambulate effectively and requires prolonged periods of immobility or convalescence." Record at 16. The ALJ noted that Mr. Tripp had been mobile since February 2007 and that, with crutches, he was able to sustain activities of daily living, with the exception of doing "heavy chores." Record at 16.

Next, the ALJ determined that Mr. Tripp had the residual functional capacity to perform sedentary work, as long as the work did not involve concentrated exposure to hazards, climbing ladders, crawling, scaffolds, ropes or more than occasional kneeling, crouching, stooping, balancing or climbing stairs and ramps. Record at 16. The ALJ followed a two-step process in reaching this conclusion. Record at 17. First, the ALJ determined, based upon the medical evidence, that Mr. Tripp's impairments could reasonably be expected to cause the symptoms he alleged. Record at 17. In the second step, however, the ALJ determined that Mr. Tripp's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible. Record at 17. In reaching this conclusion, the ALJ compared Mr. Tripp's statements with the objective evidence and analyzed both using the factors spelled out in SSR 96-7p. The ALJ also identified inconsistencies in Mr. Tripp's testimony. Record at 17. For example, Mr. Tripp testified he was only able to walk 20 to 40 feet with crutches but in his response to an Activities of Daily Living Questionnaire he stated he could walk for an hour. Record at 17. Additionally, Dr. Thomas Rappette reported that Mr. Tripp's ability to perform daily activities was reduced by 20 to 50 percent, and that his ability to walk, stand, stoop, turn, climb, push and pull were reduced by over 50

percent. Record at 17. However, Dr. Rappette also stated that
Mr. Tripp had the full capacity to sit, speak, travel (public
transportation) and lift 10 pounds at a time. Record at 17. The
ALJ concluded that these limitations were within the parameters
of the residential functional capacity. Record at 17. In
addition, the ALJ noted that Mr. Tripp was able to bare weight on
his right foot, and that his physical therapy records
demonstrated progress. Record at 17. Also, significant to the
ALJ was the fact that his physical therapy records demonstrated
progress, with "natural flexion of 65 degrees, plantar flexion of
46 degrees, and dorsiflexion 80 degrees in June and planter
flexion at 45 degrees and dorsiflexion at 85 degrees in July."
Record at 17. The ALJ did acknowledged that Mr. Tripp's ankle
got worse in November, but he also noted that the record
contained no evidence of further treatment. Record at 17-18.

To conclude this step, the ALJ indicated that he gave
reduced weight to the reviewing DDS physician. Record at 18. The
physician projected that as of January 28, 2008; Mr. Tripp would
be able to conduct light work. Record at 18. Light work includes
lifting 10 pounds frequently and 20 pounds occasionally and
standing, walking or sitting for six hours out of ten-hour work
day. Record at 18. The ALJ did not rely on this projection

because it was inconsistent with the medical evidence in the record, which indicated that Mr. Tripp was limited to sedentary work. Record at 18.

At step four, the ALJ determined that Mr. Tripp was unable to perform his past relevant work. Record at 18. The ALJ concluded that Mr. Tripp's prior employment remodeling homes and working as a warehouse manger/machine rebuilder were both skilled and heavy, and that his job managing a warehouse was skilled and medium. Record at 18. Because Mr. Tripp's residual functional capacity limits him to sedentary work, he would be unable to perform any of this past relevant work. Record at 18. In addition, the ALJ found that the transferability of job skills was not material to the determination of disability because the Medical-Vocation Rules provide a framework for a finding that Mr. Tripp is "not disabled." Record at 18.

At step five, the ALJ determined that, considering Mr. Tripp's age, education, work experience and residual functional capacity there were jobs that he could perform that existed in significant numbers in the economy. Record at 18. The ALJ concluded that Mr. Tripp could successfully adjust to other work and could perform sedentary jobs such as bench assembler (1,900 jobs in the Chicago area), telephone order clerk (3,600 jobs in

the Chicago area), or surveillance system monitor (2,000 jobs in the Chicago area). Record at 19. Accordingly, the ALJ concluded that Mr. Tripp was not disabled. Record at 19.

## SOCIAL SECURITY REGULATIONS

For an individual to obtain disability insurance benefits he must prove the existence of a disability. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). In order to make this determination, the Social Security Regulations provides a five-step analysis. *Id.* First, the ALJ must determine whether the claimant is currently employed. *Id.* Second, the ALJ must decide whether the claimant has a severe impairment. *Id.* Third, the ALJ must make a determination as to whether the claimant's impairment meets or equals one of the impairments listed by the Social Security Administration in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* Fourth, the ALJ must determine the claimant's residual functional capacity ("RFC") and whether the claimant can perform his past work. *Id.* Fifth, the ALJ must determine whether the claimant is capable of performing work in the national economy. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* This burden shifts to the Social Security Administration at step five. *Id.*

## STANDARD OF REVIEW

27

A district court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The evidence must be more than a mere scintilla. *Id.* In making this determination, the court may not substitute its own judgment for the ALJ's judgment on the issue of credibility or conflicting evidence. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005), (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).

The Court must remand if the ALJ poorly articulated his conclusion so as to prevent meaningful review. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Regardless of the amount of evidence in the record, the ALJ must "build an accurate and logical bridge from the evidence" to his decision. *Id.* (citing *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). However, where conflicting evidence regarding the claimant's potential disability would cause reasonable minds to differ, the ultimate decision is the responsibility of the ALJ, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

**DISCUSSION**

Mr. Tripp raises two issues before this court. First, he

argues that the ALJ's finding that he had the RFC to perform a range of sedentary work was not supported by substantial evidence. Pl.'s Mem. In Supp. of a Mot. to Reverse the Final Decision of the Comm'r of Soc. Security. 11, Dec. 7, 2010. Second, Mr. Tripp argues that the testimony of the vocational expert was inadequate. Pl.'s Mem. In Supp. of a Mot. to Reverse the Final Decision of the Comm'r of Soc. Security. 12.

**A. The ALJ's Finding that Mr. Tripp Could Perform Sedentary Work**

Mr. Tripp argues that the ALJ's finding that he is capable of performing a range of sedentary work is not supported by substantial evidence. In particular, he argues that the ALJ failed to give weight to his testimony that he needs his crutch "most of the time" and when walking "back and forth through the house; 20, 40 feet." Pl.'s Mem. In Supp. of a Mot. to Reverse the Final Decision of the Comm'r of Soc. Security. 11-12. Had the ALJ credited this testimony, Mr. Tripp argues, he could not have reached the conclusion he did concerning Mr. Tripp's ability to perform sedentary work.

The ALJ does not need to address every piece of evidence to satisfy the substantial evidence test. *Stark v. Astrue*, 2008 WL 2066464 at *6 (7th Cir. May 16, 2008). But the ALJ's decision

must be supported by objective evidence from the record. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). The ALJ should rely on objective observations and not merely "a recitation of a claimant's subjective complaints." *Rice*, 384 F.3d at 371 (holding it was justifiable for the ALJ to discount the plaintiff's individual evaluations of her symptoms). However, the ALJ must explain his reasons for accepting and rejecting evidence. For example, in *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011), the Seventh Circuit reversed the decision of an ALJ who relied, without an explanation, on the opinion of two physicians that contradicted the opinion of the only physician who examined the claimant.

The Record supports the ALJ's finding that Mr. Tripp could perform sedentary work. Sedentary work requires occasionally walking and standing and "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). The Record includes subjective testimony from Mr. Tripp that he could only walk about 20 to 40 feet with a crutch and that he needed to rest even after short periods of movement. Record at 28, 135. Despite this evidence, the record also contains subjective

testimony from Mr. Tripp that directly contradicts these statements. For example, he indicated in May of 2007 that he was able to walk one block. Record at 248, 250, 356, 411. Also, in August of 2007, Mr. Tripp indicated that he could walk "1-3 blocks" and only needed a cane for long walks. Record at 347. Additionally, Dr. Rappette indicated that Mr. Tripp could lift 10 pounds despite Mr. Tripp's testimony that his doctor gave him a five-pound limit. Record at 28, 191, 218.

The ALJ's finding that Mr. Tripp "uses crutches to ambulate at times" and had the ability to perform sedentary work is consistent with the Record. Record at 16. The ALJ did not just rely on subjective testimony, but instead used the whole record to determine that Mr. Tripp was capable of performing sedentary work. Record at 17; See Rice, 384 F.3d at 371. For instance, Mr. Tripp indicated in an Activities of Daily Living Questionnaire that he had the ability to walk for an hour. Record at 17. Additionally, although Dr. Rappette reported Mr. Tripp's ability to perform activities of daily living was 20 to 50 percent reduced, there was nothing to suggest that this reduction would preclude sedentary work. Record at 17. Furthermore, the ALJ acknowledged that Mr. Tripp's physical therapy records reflected continued pain. Record at 17. However, the ALJ also indicated

that the same records reflected progress and that Mr. Tripp's ankle was better overall "with neutral flexion of 65 degrees, plantar flexion of 46 degrees, and dorsiflexion 80 degrees in June 2007...[and] in July 2007...plantar flexion at 45 degrees and dorsiflexion at 85 degrees." Record at 17.

In addition, unlike *Martinez*, the ALJ did not just focus on objective evidence that supported his opinion. The ALJ specifically gave the opinion of the reviewing DDS physician reduced weight because his predictions were inconsistent with the medical evidence in the record. Record at 18; *see Martinez* 630 F.3d at 698 (7th Cir. 2011). Nevertheless, the ALJ still determined that Mr. Tripp's subjective testimony regarding the need for his crutch was not credible by considering the evidence in the record as a whole.

Mr. Tripp also introduced additional medical records following the ALJ hearing. Record at 429-37. Sentence six of 42 U.S.C. §405(g) holds that the plaintiff's additional evidence will only be considered if the plaintiff demonstrates that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *See* 42 U.S.C. §405(g); *Perkins v. Charter*, 107 F.3d 1290, 1296 (7th Cir. 1997). Additionally, evidence that is

introduced after the ALJ hearing is material when there is a "reasonable possibility" that a different conclusion would have been rendered if the new evidence had been analyzed. *Id.*

Mr. Tripp introduced a doctor's note, which indicated that he was "unable to maintain gainful employment," an MRI of his lumbar spine, and note from Dr. Rappette. Record 431, 436-37. The MRI findings are not relevant to Mr. Tripp's ankle injury and the doctors' notes are conclusory. They do not include any medical findings about Mr. Tripp's ability to walk or need to use a crutch. Record at 431, 437. Therefore, the Court has no reason to think that the ALJ would have reached a different conclusion had he considered this evidence. *Perkins*, 107 F.3d at 1296; Record at 436.

Mr. Tripp also argues that the ALJ's hypothetical questions to the vocational expert were incomplete. Pl.'s Mem. In Supp. of a Mot. to Reverse the Final Decision of the Comm'r of Soc. Security. 12. In particular, he argues that the ALJ's questions to the vocational expert did not specify what kind of hand held assistive device the hypothetical individual used or how often he would need it to ambulate. Pl.'s Mem. In Supp. of a Mot. to Reverse the Final Decision of the Comm'r of Soc. Security. 12.

The ALJ's hypothetical questions to the vocational expert

"must include all limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942. However, the ALJ need only incorporate the limitations or impairments that he finds credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (citing *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007)). In *Simila*, the ALJ, relying on the testimony of a vocational expert, determined that the claimant was not·disabled. 573 F.3d at 507. The claimant argued that the ALJ's holding should be reversed because she failed to include in her hypothetical questions several limitations, including the claimant's difficulties with concentration and standing for long periods of time. 573 F.3d at 521. The Seventh Circuit affirmed and held that the ALJ need not include in her hypothetical those impairments she did not find to be credible. *Id.*

This is what happened here. The ALJ determined that, although Mr. Tripp's symptoms were reasonably expected, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible, when compared against the objective evidence and evaluated using factors in SSR 96-7p." Record at 17. As in *Simila*, the ALJ here explained that the record evidence contradicted Mr. Tripp's testimony that he needed to use his crutch "most of the time"; and, because of this, the

ALJ declined to credit that testimony. Accordingly, the Court sees no error in the ALJ's decision to reject this limitation in the hypothetical.

### B.    The VE's Testimony

Next, Mr. Tripp argues that the vocational expert erred by not providing Dictionary of Occupational titles for the unskilled sedentary jobs that he contended Mr. Tripp could perform. Pl.'s Mem. In Supp. of a Mot. to Reverse the Final Decision of the Comm'r of Soc. Security. 13. Mr. Tripp devoted a total of three sentences to this argument; he did not bother to flesh it out, nor did he file a reply brief, despite having an opportunity to do so. While his argument is less than clear, to the extent he is arguing that there was a conflict in the vocational expert's testimony and the Dictionary of Occupational titles, and that this error requires remand, the Court rejects the argument. For the Court to consider a remand, there has to be an obvious and unreasonable conflict between the Dictionary of Occupational Titles ("DOT") and the vocational expert's testimony. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Stark*, 2008 WL 2066464 at *6. A conflict between the vocational expert's testimony and the DOT is a harmless error if it is not obvious enough for the ALJ to recognize or if the claimant does not identify the

conflict at the hearing. *Terry*, 580 F.3d 471 at 478 (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). Here, neither Mr. Tripp nor his attorney ever raised the issue; nor did they question the VE, despite being given the chance to do so.

## CONCLUSION

For the reasons explained above, the Court finds that the ALJ's findings concerning Mr. Tripp's RFC were supported by substantial evidence, and that the ALJ's hypothetical questions to the VE were appropriate. Accordingly, the Court denies Mr. Tripp's motion for summary judgment and grants the Commissioner's motion for summary judgment.

Dated: July 28, 2011          E N T E R:


*Arlander Keys*
ARLANDER KEYS
United States Magistrate Judge